UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

YUN LIN,                          :
                                  :    Civil Action No. 10-5489 (DMC)
                Petitioner,       :
                                  :
                v.                :    **OPINION**
                                  :
GREG BARTKOWSKI, et al.,          :
                                  :
                Respondents.      :

**APPEARANCES:**

> YUN LIN, <u>Pro</u> <u>Se</u> Petitioner
> # 276686/898776B
> New Jersey State Prison
> P.O. Box 861
> Trenton, New Jersey 08625
>
> VEROD ADONI, ESQ.
> BERGEN COUNTY PROSECUTOR'S OFFICE
> 10 Main Street
> Hackensack, New Jersey 07601

**CAVANAUGH**, District Judge

Petitioner Yun Lin ("Petitioner"), a convicted state prisoner presently confined at the New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his New Jersey state court judgment of conviction entered on or about February 16, 1995.  For the reasons stated herein, the Petition will be denied for lack of substantive merit.

## I.  BACKGROUND

A.  Procedural History

On June 1, 1994, a Bergen County Grand Jury indicted Petitioner and six co-defendants, Jeffrey Zhu, Xin Dan Lin, Chao Lin Feng, Cho Lee Lin, Simon Lau and Sing Jun Jang, on numerous charges as follows: (Counts 1 through 5) capital murder; (Counts 6, 7, 8, and 9) murder of Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 10, 11, 12, and 13) felony murder-kidnapping of Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 14, 15, 16 and 17) felony murder-burglary Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 18, 19, 20 and 21) felony murder-arson Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Count 22) attempted murder of Chang Liang Lin; (Count 23) attempted murder of Ah Mee Lui a/k/a Ming Cheng; (Count 24) kidnapping of Liang Qun Guo; (Count 25) kidnapping of Chang Liang Lin; (Count 26) burglary; (Count 27) attempted arson; (Counts 28 through 34) possession of various weapons for an unlawful purpose, including a .25 automatic, a .380 automatic, a "Mac 11," a .38 Smith and Wesson, a ".357 Mag," a "9 mm Lug," and knives and a saw; (Count 35) unlawful possession of a weapon, namely a "9 mm Mac 11;" (Count 36) possession of a defaced firearm - 25 Auto; (Count 37) possession of a defaced firearm - 9 mm Mac 11; and (Count 38)

2

possession of hollow point bullets.  (Petitioner's Brief at pp.
1-2; Indictment).

     A trial was held before the Honorable William C. Meehan,
J.S.C. and a jury on September 11, 1995.  Trial concluded on
December 15, 1995, when the jury convicted Petitioner on (Counts
6 through 9) murder of Ling Wang Guo, Yu Ping Zhang, Guang Sheng
Li and Liang Qun Guo, respectively; (Counts 13 through 17) felony
murder-kidnapping of Liang Qun Guo and felony murder-burglary of
Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo,
respectively; (Counts 22 and 23) attempted murder of Chang Liang
Lin and Ah Mee Lui a/k/a Ming Cheng; (Counts 24 and 25)
kidnapping of Liang Qun Guo and Chang Liang Lin; (Count 26)
burglary; (Count 27) attempted arson; (Counts 28-33) 2nd degree
possession of weapons, various firearms, for an unlawful purpose;
(Count 34) 3rd degree possession of weapons, namely, knives and a
saw, for an unlawful purpose; (Count 35) unlawful possession of a
weapon - 9 mm Mac 11; (Count 37) possession of a defaced firearm
- 9 mm Mac 11; and (Count 38) possession of hollow point bullets.
Counts 1 through 5 charging capital murder were dismissed.
Petitioner was acquitted of the remaining charges, Counts 10-12,
18-21, and 36.  (Petitioner's Brief at pp. 2-3; Judgment of
Conviction).

     On February 16, 1996, Judge Meehan sentenced Petitioner to
an aggregated sentence of four consecutive terms of life

3

imprisonment with 140 years of parole ineligibility. (Pet. Brief at pg. 4).

In March 1996, Petitioner filed a Notice of Appeal with the Superior Court of New Jersey, Appellate Division. (Pet. Brief at pg. 4). On April 5, 1999, the Appellate Division affirmed the conviction and aggregate sentence, but remanded the matter for appropriate mergers. (Respondents' Exhibit 3 - April 5, 1999 Appellate Division Opinion).

On February 29, 2000, the Supreme Court of New Jersey granted certification limited solely to the issues arising out of courtroom security measures used during Petitioner's trial. State v. Lin, 163 N.J. 78 (2000). On October 23, 2000, the Supreme Court of New Jersey affirmed the Appellate Division's decision.   State v. Zhu, et al., 165 N.J. 544 (2000).

In November 2000, Petitioner promptly filed a petition for postconviction relief ("PCR") in state court, which was denied without an evidentiary hearing by Judge Meehan on December 9, 2005.[1]   (Pet. Brief at pg. 5).   Petitioner field an appeal with the Appellate Division.   On April 6, 2010, the Appellate Division affirmed the trial court's denial of the PCR petition.   State v.

---

[1]   Oral argument on the PCR petition was conducted on November 21, 2005.   A copy of the November 21, 2005 PCR Transcript ("PCRT") was attached at Exhibit C to the Reply/Traverse filed by co-defendant Xin Dan Lin in his related habeas case, Xin Dan Lin v. Bartkowski, et al., Civil No. 10-5491 (DMC) at Docket entry no. 13-3.

Cho Lee Lin, et al., 2010 WL 1330272 (N.J. Super. A.D., April 6, 2010).  The Supreme Court denied the petition for certification on June 30, 2010.  State v. Lin, 203 N.J. 92 (2010).

Petitioner timely filed this habeas petition, pursuant to 28 U.S.C. § 2254, on or about October 20, 2010.  The State responded to the petition, and provided the relevant state court record, on August 5, 2011 and August 9, 2011.  Petitioner filed a reply/traverse on or about September 7, 2011.

B.  Factual Background

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply reproduce the recitation as set forth in the published opinion of the Supreme Court of New Jersey, decided on October 23, 2000, with respect to Petitioner's direct appeal:

> Defendants are members of a Chinese gang known as Fuk Ching. The gang's activities included extortion, arson, and loan sharking.  At the time of the murders the gang derived profits from smuggling illegal Chinese aliens into the United States.  The immigrants purportedly paid between $20,000 and $30,000 for transportation and were required to pay back approximately $1,000 a month to the gang.  Many, if not most, of the immigrants took low-paying jobs and were forced to live as cheaply as possible, often in gang-run "safe houses."  If the immigrants did not repay the debt, they were held captive and sometimes beaten.  Some aliens became involved in the gang's criminal activities.
>
> In furtherance of the gang's operations, a ship carrying hundreds of illegal Chinese immigrants was due to arrive off the coast of Massachusetts in 1993.  Rival members within the Fuk Ching gang decided that they would kill the gang's leader and other high-ranking members and thereby take

control of those expected immigrants.  On May 24, 1993, the rivals attempted to carry out their plan by attacking a safe house in Teaneck, New Jersey.  There were four gang members and one smuggled alien living in the house, and defendants shot or stabbed all of the occupants (one occupant was actually shot outdoors as he attempted to escape harm). Four of the victims of the attack died; one victim, the alien, survived.

Having received descriptions of the getaway van seen by witnesses, the police arrested all defendants (except defendant Lau) a short time after the shooting at a roadblock near the George Washington Bridge.  The police retrieved numerous weapons from defendants and the safe house, including guns, knives, handcuffs, a container of gasoline, and ammunition.  The police also found blood-stained clothing in the van.  Defendant Lau, who had fled the murder scene in a separate vehicle, was arrested sometime later in Florida and extradited to New Jersey. Defendants were indicted on numerous counts of murder, attempted murder, felony murder, kidnapping, burglary, attempted arson, and various weapons offenses.

(State v. Zhu, et al., 165 N.J. 544, 547-48 (2000)).

This Court also relies upon the recitation of facts as set forth in the unpublished opinion of the Superior Court of New Jersey, Appellate Division, decided on April 6, 2010, with respect to Petitioner's appeal from denial of his state PCR petition:

These were the salient proofs at trial.  Defendants were members of Fuk Ching, a Chinese gang operating in the New York area.  Among other activities, the gang smuggled people from China into the United States.  The Fuk Ching would hold the smuggled aliens in a "safe house" until a sum of money between $20,000 and $30,000 had been paid.

At some point, there was a falling out between Fuk Ching's leader, Ah Kay, and another gang member, co-defendant Xin Dan Lin.  As a result, Ah Kay ordered the killing of Xin Dan Lin.  Two gang members were killed in New York, but Xin Dan Lin managed to escape when the gun held to his head jammed. Ah Kay decided to hide out.  He left his brother Ah Wong in

6

charge of the gang and a safe house on Somerset Road in
Teaneck. Ah Wong lived in the house and was responsible for
handling all arrangements there. At the time of the
murders, there were four gang members living in the house
along with one of the smuggled aliens. It was Ah Wong and
these four gang members who became defendants' victims on
the evening of May 24, 1993. The alien, Lin Ling Chang, was
the only survivor. He identified defendants Xin Dan Lin,
Yun Lin, Chao Lin Feng, and Cho Lee Lin as among those who
committed the murders and who attempted to murder him.

According to Lin Ling Chang, earlier in the day, three of
the four resident gang members had left the house, leaving
one gang member, Liang Qun Guo (also a brother of Ah Kay),
with Lin Ling Chang. While Lin Ling Chang was in the
kitchen, he heard the doorbell ring. Liang Qun Guo went to
the door and moments later a number of people entered the
kitchen. One of the defendants pointed a gun at Lin Ling
Chang's head. Liang Qun Guo started to fight with the
intruders. Gunshots were fired. Both Lin Ling Chang and
Liang Qun Guo were shot. They were dragged to the basement,
tied, and duct taped.

On the evening of May 24, 1993, Ming Cheng, a member of Fuk
Ching and Ah Wong's bodyguard, drove from New York to
Teaneck with Ah Wong and two other gang members, Yu Ping
Zhang and Guang Sheng Li. Upon their arrival, they found
the house locked, and no one answered the doorbell. Yu Ping
Zhang and Guang Sheng Li gained entrance to the house
through a window in the back. Ming Cheng went to the front
door. He was not aware of how Guang Sheng Li got inside the
house.

After Ming Cheng and Ah Wong had returned to the front door,
the door opened and Ming Cheng heard a gunshot. He pushed
the door open and saw Xin Dan Lin with a gun and several
other persons on the stairs inside. He warned Ah Wong and
they both ran, but in opposite directions. Ming Cheng ran
two or three blocks and hid in some bushes. He saw Ah Wong
lying on the ground with three people standing over him and
then heard some gunshots.

Alan Tam, one of the main witnesses against defendants, was
a member of the Fuk Ching. He pled guilty in federal court
to charges related to the killings and agreed to testify at
this trial. Alan Tam testified that in early April 1993, he
spent several days at an apartment in Brooklyn where Simon
Lau, Chao Lin Feng, and Jeffrey Zhu attempted to recruit him

7

to participate in the murder of Ah Wong.  The motivation behind this plot was to gain control of the alien smuggling business and to strike back for the attempted killing of Xin Dan Lin.  Alan Tam met with Ah Wong four days before the killing.  He did not warn Ah Wong of the murder plot against him.

Tu Wei Chung was also a member of the Fuk Ching gang.  Like Tam, he testified for the State pursuant to a plea agreement on federal charges.  He corroborated Tam's testimony.

Rhonda Spencer lived in the neighborhood.  She testified that shortly after 7:00 p.m., while sitting in front of her residence, she heard something that sounded like glass breaking. She also heard about four gun shots and ran down to find her younger brother who was playing on a nearby street.  She saw a group of men running across a lawn. While this group of men was running, she saw another man, with a black stadium jacket, get into a blue van.  The van then picked up the men who were running.

Teaneck Police Detective Kenneth Croonquist was the first police officer to arrive at the scene.  Upon arrival, he approached the front door, peered in, and saw an Asian male apparently dead.  A small weapon was partially under the victim's legs.  Sergeant Croonquist saw knives and handguns scattered about the house.  A second victim was found in the hallway, lying on his side with no pulse.  Two more victims were found on the floor of the basement.  Each of these victims were handcuffed and had duct tape over their mouths. One of them, Lin Ling Chang, survived.  Among the assassins, Ah Wong, Guang Sheng Li, Yu Ping Zhang and Liang Qun Guo died.  Ming Cheng escaped.

Teaneck Police Officer Frank Cox was on patrol in a marked police car with Officer Kenneth Porrino.  Upon hearing a police broadcast of a multiple shooting in Teaneck, they drove to the toll plaza at the George Washington Bridge.  At 7:33 p.m., they saw a blue van with Asian males, which fit the description provided in the SPEN emergency broadcast, approaching the toll plaza.  They pulled up close behind the van, turning on the overhead lights and siren.  Officer Kevin Mahon used his public announcement system to instruct the driver to throw the keys out of the window and to come out of the van.  The driver was defendant Jeffrey Zhu.

(State v. Cho Lee Lin, et al., 2010 WL 1330272, *1-2 (N.J. Super.

A.D., April 6, 2010)).

8

Finally, in a consolidated opinion of the six direct appeals filed by the various co-defendants in this matter, including Petitioner's direct appeal, the Appellate Division summarized the pertinent facts and evidence as follows:

> There were numerous guns, knives and bullets, among other items, found by the police throughout the house. It was determined that the guns in the house were the weapons used to shoot the victims found in the house.
>
> A number of residents in the area heard the gun shots and saw much of the killing of Ah Wong, as well as the defendants' get-away. As a result of their eye-witness accounts, the two get-away cars were identified and, ultimately, found, as was the nine-millimeter weapon that was used to shoot Al Wong and then thrown under a parked car.
>
> Shortly after the shootings and stabbings, one of the get-away vehicles, a blue van, was spotted by the police as it approached a toll plaza near the George Washington bridge. The vehicle was stopped and the five occupants, defendants Jeffrey Zhu, Xin Dan Lin, Yun Lin, Chao Lin Feng and Cho Lee Lin, were arrested and searched. A knife sheath was found on Zhu. A bullet that matched bullets in an assault weapon found in the front foyer of the house was retrieved from one of Xin Dan Lin's pockets. Numerous inculpatory items were seized from the defendants and the vehicle, including blood-stained clothing.
>
> Blood stain analysis performed on the clothing revealed human blood found on Xin Dan Lin's blue jeans and shoes, on Chao Lin Feng's gold jacket, tee-shirt, black jeans and both sneakers, on Cho Lee Lin's tan jacket, and on the jacket found in the van. DNA analysis revealed that the blood from Cho Lee Lin's tan jacket matched that of Liang Qun Guo (the victim found murdered in the basement), that the blood found on Chao Lin Feng's tee-shirt matched that of Yu Ping Zhang (one of the victims found murdered in the hallway), and that the blood found on Xin Dan Lin's blue jeans also matched that of Yu Ping Zhang. In addition, DNA analysis of blood found on a jacket in the van matched the blood of victim Yu Ping Zhang.

9

None of the physical evidence at the scene linked Simon Lau
to the crimes.  However, when the second vehicle was later
found abandoned on the lower east side of Manhattan, it was
discovered that it was registered to Simon Lau's sister.
Moreover, Ming Cheng identified him as a participant at the
scene and gang members Allan Tam and Henry Tu provided
testimony that he was actively involved in the planning of
the killings.
Finally, a search of Chao Lin Feng's apartment at 5413 5th
Ave., Brooklyn, revealed a sketch of the layout at 1326
Somerset, which had Tam's fingerprints on it; green knife
sheaths; duct tape; a match book with the name "Simon" and a
telephone number inscribed on it; a plastic container
similar to the containers found at 1326 Somerset that had
gasoline in them; and fingerprints of both Chao Lin Feng and
Xin Dan Lin.

(Resp. Ex. 4, April 5, 1999 Appellate Division Opinion, State v.
Lin, Docket No. A-5041-95T4 slip op. at 9-10 (N.J.Super.Ct.,
App.Div., Apr. 5, 1999).

## II.  STATEMENT OF CLAIMS

Petitioner asserts the following claims in his petition for
habeas relief:

**POINT I**:  Petitioner's rights to due process and an
impartial jury as guaranteed by the Sixth and Fourteenth
Amendments to the United States Constitution were violated due to
trial court's inadequate voir dire and deprivation of
Petitioner's statutory rights to intelligently challenge jurors
for cause and exercise peremptory challenges.

A.  The jury selection procedures employed by the trial
court resulted in impermissibly cursory jury voir dire.

B.  The jury selection procedures and practices by the trial
court violated Petitioner's constitutional right to a fair and

impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**POINT II:** The trial court committed reversible error by denying Petitioner's motion to voir dire the jury regarding published prejudicial information, thereby violating Petitioner's right to be tried by a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and that of the New Jersey Constitution, 1947 Art. 1, Par. 10.

**POINT III:** The trial court erred by allowing the proceedings to be conducted in such a manner as to deprive defendant of his right to a fair trial when the trial court consistently permitted sheriff officers to act in such a manner as to give the jury the perception that the defendant was guilty, depriving Petitioner of his Fifth Amendment right to a presumption of innocence and a fair trial.

**POINT IV:** "The trial court's accomplice liability instruction failed to convey to the jury that in any or all of the offenses charged, the accomplice could be found guilty to a lesser degree than the principal, based on the accomplice's own mental state eroded the prosecution's burden to prove guilt beyond a reasonable doubt, rendered Petitioner's trial fundamentally unfair in violation of his right to a fair trial

11

and due process under the United States Constitution Amendments Sixth and Fourteenth."

**POINT V:** Petitioner was deprived of effective assistance of trial counsel when counsel failed to exercise Petitioner's six remaining peremptory challenges to strike certain jurors, which resulted in a biased jury thereby depriving Petitioner of his right to effective assistance of counsel, due process of law, and a fair and impartial jury, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, and the New Jersey Constitution (1947) Art. I, Pars. 1, 9, 10.

**POINT VI:** Cumulative Error.

The State essentially contends that Ground I is procedurally defaulted, and that Grounds II, III, IV, V, and VI lack merit, and/or fail to raise a federal constitutional issue. To the extent that Petitioner's Ground I is procedurally defaulted, this Court will deny it on the merits pursuant to 28 U.S.C. § 2254(b)(2)("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). See Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005)("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit. Under 28 U.S.C. § 2254(b)(2), we may reject

12

claims on the merits even though they were not properly
exhausted, and we take that approach here").

### III. STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than
more formal pleadings drafted by lawyers. Estelle v. Gamble, 429
U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).
A pro se habeas petition and any supporting submissions must be
construed liberally and with a measure of tolerance. See Royce
v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney
General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v.
Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399
U.S. 912 (1970). Thus, because Davenport is proceeding as a pro
se litigant in this matter, the Court will accord his habeas
petition the liberal construction intended for pro se
petitioners.

Section 2254(a) of Title 28 of the United States Code gives
the court jurisdiction to entertain a habeas petition challenging
a state conviction or sentence only where the inmate's custody
violates federal law. 28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to
deciding whether a conviction violated the Constitution, laws, or
treaties of the United States." Estelle v. McGuire, 502 U.S. 62,
67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County
Probation Dep't, 128 F.3d 152, 159 (3d Cir. 1997). "Federal

13

courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). Generally, "[i]f a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable," Engle v. Isaac, 456 U.S. 107, 120 n. 19 (1982), and "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

In reviewing a § 2254 petition, a federal court is not permitted to address a federal constitutional claim pertinent to the facts of the case unless the petitioner asserts the claim as a ground for relief. That is, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). In addition, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997)(citations and internal quotation marks omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

In addition to the case law, the Antiterrorism and Effective Death Penalty Act ("AEDPA") limits a federal court's authority to grant habeas relief when a state court has adjudicated

14

petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court. See 28 U.S.C. § 2254(d).

The unreasonableness standards of § 2254(d) govern only claims that were "adjudicated on the merits in State Court proceedings." 28 U.S.C. § 2254(d). "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004)(citations and internal quotation marks omitted), reversed on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374 (2005); see also Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006). A state court may render an adjudication on the merits of a federal claim by rejecting the claim without any discussion whatsoever. See Rompilla, 355 F.3d at 247. See also Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538 U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)(even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference)). On the

other hand, "[i]f the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply." Rolan, 445 F.3d at 678. See also Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000)(with respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).

If the New Jersey courts adjudicated the petitioner's claims on the merits, this Court may not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied. See 28 U.S.C. § 2254(d). Accordingly, this Court may not grant habeas relief to the petitioner unless the adjudication of a federal claim by the New Jersey courts involved an unreasonable application of clearly established Supreme Court law, see 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and Adamson is in custody in violation of the Constitution or laws or treaties of the United States. See 28 U.S.C. § 2254(a), (d)(2).

When the grounds raised in the petition are governed by 28 U.S.C. § 2254(d)(1), the court must begin its analysis by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to

16

the dicta, of [the Supreme Court's] decisions as of the time of
the relevant state-court decision." Williams v. Taylor, 529 U.S.
362, 412 (2000). A court must look for "the governing legal
principle or principles set forth by the Supreme Court at the
time the state court renders its decision." Lockyer v. Andrade,
538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within
28 U.S.C. § 2254(d)(1), if the state court "contradicts the
governing law set forth in [the Supreme Court's] cases" or if it
"confronts a set of facts that are materially indistinguishable
from a decision of th[e Supreme] Court and nevertheless arrives
at a [different] result." Williams, 529 U.S. at 405-06. Under
the "'unreasonable application' clause of § 2254(d)(1), a federal
habeas court may grant the writ if the state court identifies the
correct governing legal principle from th[e Supreme] Court's
decisions but unreasonably applies that principle to the facts of
the prisoner's case." Id. at 413. Whether a state court's
application of federal law is "unreasonable" must be judged
objectively; an application may be incorrect, but still not
unreasonable.[2] See id. at 409-10. "The unreasonable application

_____

[2] See also Marshall v. Hendricks, 307 F.3d 36, 71 n. 24 (3d
Cir. 2002)("[D]ecisions of federal courts below the level of the
United States Supreme Court may be helpful to [a court] in
ascertaining the reasonableness of state courts' application of
clearly established United States Supreme Court precedent, as
well as helpful amplifications of that precedent.")(citations and
internal quotation marks omitted).

test is an objective one-a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

## IV.  ANALYSIS

### A.  Jury Selection Procedures Claim

In his first claim for relief, Petitioner asserts that the jury selection procedures at his trial violated his constitutional rights to due process and a fair and impartial jury as guaranteed under the Sixth and Fourteenth Amendments. In particular, Petitioner claims that the trial court conducted a cursory jury voir dire that infringed his ability to

intelligently challenge jurors for cause and exercise his peremptory challenges.

Prior to jury selection, the trial court decided, with the agreement of all parties, that an extensive juror questionnaire should be prepared so as to address numerous concerns regarding the trial. These concerns involved the security measures to be taken by the Sheriff's Department at trial; media and news reports that had covered aspects of the Petitioner's case involving Chinese gangs and the smuggling of illegal aliens; the fact that Petitioner, his co-defendants and most of the victims were illegal aliens; and a substantial likelihood that racial issues would be inextricably bound with issues to be decided at trial and bias on the part of potential jurors. Accordingly, on May 30, 1995, the trial court ordered that defense counsel submit a draft of proposed voir dire questions and designate two attorneys to conduct individual voir dire questioning should such individual voir dire questioning be required. Each potential juror was to complete the questionnaire before their in-court voir dire, which, among other things, would indicate his/her occupation, familiarity with the case, attitude towards illegal immigrants and gangs and defendants' race. The completed questionnaires were to be photocopied by the prosecutor's office and each defendant's counsel would be given a copy to review before voir dire. (Pet. Brief at pp. 15-16).

19

At the beginning of jury selection, the trial court voir

dired prospective jurors based on their answers to the

questionnaires. Defense counsel was then allowed to ask follow-

up questions based on the answers to the questionnaires. This

became a time-consuming process such that after two whole days of

jury selection, only six jurors were qualified. Consequently,

the prosecutor complained and the trial court "dramatically

reduced" the number of questions posed to prospective jurors. In

addition, as Petitioner argues:

> The questions asked were leading in nature - making the
> correct answer unmistakably clear to the jurors, by placing
> the weight of the court's authority behind a suggested
> answer. Moreover, when a biased answer was offered by a
> juror, the court would abruptly intercede with close-ended,
> heavy-handed and highly leading questions; not probing for
> the source of possible bias, but aimed to qualify a juror
> via programmed "yes" or "no" response.

(Pet. Brief at pp. 16-17).

Defense counsel objected to this process, but the trial

court ignored the complaints, noting that defense counsel had

drafted the questionnaires.

Petitioner further asserts that, because the prosecutor

complained about photocopying the questionnaires, the trial court

ruled that no standard voir dire questions would be asked, that

the court would only rely on the completed questionnaires to

conduct voir dire, and that the defense would not be given a copy

of the questionnaire. Petitioner concedes that the court did

agree to defense counsels' suggestion that, under these

circumstances, all questions contained in the questionnaire would be asked verbally so counsel could hear the answers.  (Pet. Brief at pg. 19).

However, as Petitioner relates, when voir dire resumed, the trial court failed to ask all the questions, and in fact, fifty (50) out of the sixty-six (66) qualified jurors were asked only two or three pointed questions.  Petitioner further asserts that the trial court spent less than one minute on each voir dire when selecting five of the sitting jurors.  Defense counsel again objected, but their objection was ignored.  (Pet. Brief at pp. 19-20).

Despite this abbreviated voir dire, after seven full days of jury selection, only 46 jurors were qualified from a pool of 500 prospective jurors.  Consequently, the court further expedited the selection process by delegating to the jury commissioner the authority of pre-qualifying potential jurors.  The court also unilaterally reviewed the questionnaires for anything of concern then let defense counsel review them.  Thus, Petitioner contends that defense counsel were "forced to review the questionnaire via circulation while the court [was] conducting the in-court voir dire of the jurors ... in direct violation of [P]etitioner's right to be present at a critical stage of his trial."  (Pet. Brief at pg. 21).  In other words, Petitioner argues, this "ex parte" process by the trial court removed defense counsel's

21

ability to review the questionnaires before voir dire and subverted counsels' ability to ask follow-up questions to determine if the court's follow-up questions.

Petitioner further argues that this truncated process "severely hampered [his] ability to participate in jury selection, resulting in the denial of [his] right to a fair and impartial jury. It only served to take away petitioner's ability to participate in juror voir dire, detect bias and intelligently exercise his peremptory challenges. The effectiveness of the questionnaires is amply demonstrated by the record, in that, when proper follow-up questions were asked by counsel based on a suspect answer, juror bias was uncovered." (Pet. Brief at pp. 22-23).

In particular, Petitioner points to the selection of three jurors, who ultimately sat on the jury, which demonstrated bias violated Petitioner's right to a fair and impartial jury. First, Juror D.R. indicated on the questionnaire that she could not decide each defendant's guilt or innocence separately, but the trial judge did not ask a follow-up question on voir dire. D.R. also answered that she read the Bergen Record every day and had heard or read about this case prior to trial. The court never asked D.R. about any bias or prejudice she may have had based on this prior knowledge. Finally, D.R. answered that she did not know if she would give law enforcement testimony greater, lesser

22

or equal weight as other testimony. On voir dire, the trial court allegedly forced the juror to respond, "I think so." (Pet. Brief at pp. 28-29).

Next, as to Juror E.O., the juror responded "Yes" to Question 31 of the questionnaire, which asked whether the immigration status of the defendants would affect her ability to deliberate fairly and decide the case solely on the facts. Juror E.O. repeated this response when the judge questioned her on voir dire several times. The judge continued to ask the same question until E.O. changed her answer. Defense counsel objected to the court's manipulation of the juror, and challenged the juror for cause. Nevertheless, the court denied their motion. Finally, E.O. indicated she had a son-in-law who was a police officer, but responded to the voir dire by the court that she would evaluate the credibility and testimony of a police officer the same as anyone else. Juror E.O. was selected for the jury. (Pet. Brief at pp. 29-31).

Finally, as to the third juror, Juror A.R., it was revealed on voir dire that she had a brother who was murdered in August 1994 and that the suspect was an illegal alien. In response to the court's questions, A.R. answered that this fact would not affect her ability to be fair because she did not plan to get involved in her brother's case. Co-counsel requested that A.R.

23

be dismissed from the jury for cause, but the court inexplicably denied the motion. (Pet. Brief at pp. 32-35).

Petitioner raised this claim in his state PCR petition. In ruling on the issue, the PCR court held as follows:

> [Defendants raise] certain requests concerning jury selection. In that regard, there is the jury questionnaire, a very extensive one prepared, and it was prepared through the cooperation of defense counsel, with the prosecutor participating, and with the Court to some extent. Twelve pages with an attached list of witnesses and so forth. And I know Mr. Zhu obtained an affidavit of Mr. Pieroni which raises, I think, questions of what he says is not quite accurate. He says there was only one for all six defense attorneys, and I know that's not accurate, because Mr. Murray was providing the first until whatever reason he became upset with some argument of counsel, and I don't remember what it was now, he wasn't going to do it. But thereafter, they were provided, sometimes a little slower than liked.
>
> But Mr. Pieroni says there was only one copy, but he ends up with 800 pages of jury questionnaire[s], and that would mean that no one else had them but him, and that's not so. Knowing Mr. McAlevy and Mr. Neary, they would not end up without their file, and I don't mean to say that Mr. Weichsel, Contaldi or Jerejian wouldn't. It is clear they were being submitted, because Mr. Pieroni says there were fifteen pages.... [T]he panel selection was not—we didn't fill a seat up at one time, we waited until we had a certain number and then proceeded to pick the jury. Then the appellate court would have to understand this is not a normal se[le]ction where a panel comes in, put fourteen in the box, and find out if they could serve or not serve. This was done by first finding out if they could spend the time, and then they filled out the questionnaire. Of the 200 jurors who showed up, according to Mr. Pieroni, I would assume that at least half walked out on a fifty-two day trial with job, plans, employment.
>
> In fact, I personally think the 200 who were never actually screened, it is more than 200, and, of course, while he complains, Mr. Pieroni, he says fifty pages of questionnaire. It's not like reading a book. We all know certain questions are very important, some are not. You

24

want to know where they work, where they live.  Then you
want such items like what newspaper they read, what high
school they went to, and the issue concerning law
enforcement officers is covered in the questions.

As I said, prepared by the defendants, gone over by the
Court, and now after the trial is over we're being told that
three jurors should not be allowed to sit on the case.  The
defendants had not run out of challenges.  As I said, you
deal with between McAlevy, Weichsel, Jerejian, Neary, and-I
shouldn't say McAlevy here, but McAlevy is a well known
criminal defense attorney who is constantly trying murder
cases all over New Jersey.  Neary is trying them in Bergen
County, at least two a year, if not more.  Jerejian tries
them.  John Weichsel tries them.  Contaldi has been involved
with them.  Pieroni, who is a regular appearing in criminal
trials in this courthouse, and they're all very active
defense attorneys.

As I said, some of the premier ones, that there is a juror
that shouldn't be there, is total nonsense, and that jurors
were rehabilitated is-sometimes there are jurors you like,
because they're making a promise to you that they will be
fair and impartial.  They didn't check it off as a routine
because they wanted to get on jury duty.  They're making the
promise, and as I say, the trial lawyers relied upon that
promise, more so than others.

There may be certain things that you like about that person,
which doesn't show here.  The appearance to understand a
respective juror.  How they talk.  You know, their voice
means a lot.  People, when evaluating jurors, how they walk,
do they slouch, do they stand up straight, do they stand up
tall.  Are they leaders, because that's one of the questions
that was asked.  Do they supervise people.

The purpose of that is to find out people in charge of
people.  Do they take care of people, leave and promoted.
I'd find beyond belief that six very active defense
attorneys would allow someone like Miss Rakowski there, that
they didn't think—or O'Brien, Reavis.  As I said, with
regard to that one, the last death penalty case I tried, one
of the jurors who stayed on had a father killed in a
burglary—it really was not quite a burglary but taking a
cash box by someone who even worked at the Sears, or leaving
to go to another building on their property, and that was
the one juror who voted for life over death.

25

> So there are reasons for leaving them on when you're a
> defendant. Again, you evaluate the entire person, not part
> of the answer. I don't find that defendants-and it's my
> recollection, not that you can check it out, but I believe
> all defendants had a few challenges left-maybe not Mr.
> Pieroni, but most of the other defendants had challenges
> left. So, it wasn't a question that this was forced down
> their throat.

(November 21, 2005 PCRT 91:15-95:15, attached as Exhibit "C" to

Petitioner Xin Dan Lin's Reply, in the related case, <u>Xin Dan Lin</u>

<u>v. Bartkowski, et al.</u>, Civil No. 10-5491 (DMC), at Docket entry

no. 13-3).

   The State responds to this claim, asserting that it is

procedurally defaulted because the Appellate Division rejected

the claim on the basis of a state procedural bar, namely,

N.J.Ct.R. 3:22-4 (Bar on Grounds Not Raised in Prior

Proceedings). It is clear, however, that the PCR court addressed

the merits of this claim and rejected it on those grounds as

well. In any event, as stated above, to the extent that

Petitioner's claims are procedurally defaulted, this Court may

deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2). <u>See</u>

<u>Bronshtein</u>, 404 F.3d at 728 ("We would permit Bronshtein to

attempt on remand to establish a reason to excuse his procedural

default, but we find it unnecessary to do so because it is

apparent that the claims in question lack merit. Under 28 U.S.C.

§ 2254(b)(2), we may reject claims on the merits even though they

were not properly exhausted, and we take that approach here").

Accordingly, this Court will turn to the merits of this claim.

"Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." Mu'Min v. Virginia, 500 U.S. 415, 431 (1991). "No hard-and-fast formula dictates the necessary depth or breadth of voir dire." Skilling v. United States, __ U.S. __, 130 S.Ct. 2896, 2917 (June 24, 2010). "The Constitution ... does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 729 (1992).

In the federal prosecution of Jeffrey Skilling, the chief executive officer of Enron, the Supreme Court rejected Skilling's claim that the voir dire was insufficient because jury selection lasted only five hours, most of the court's questions were conclusory and failed to adequately probe jurors true feelings, and the court consistently took prospective jurors at their word once they claimed they could be fair. See Skilling, 130 S.Ct. at 2918. In that case, the district court "initially screened venire members by eliciting their responses to a comprehensive questionnaire drafted in large part by Skilling. That survey helped to identify prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array." Id. at 2919. The Supreme Court held that

Skilling failed to show that the five-hour voir dire violated
Skilling's constitutional right to an impartial jury:

> The District Court, moreover, did not simply take venire
> members who proclaimed their impartiality at their word ....
> [A]ll of Skilling's jurors had already affirmed on their
> questionnaires that they would have no trouble basing a
> verdict only on the evidence at trial. Nevertheless, the
> court followed up with each individually to uncover
> concealed bias. This face-to-face opportunity to gauge
> demeanor and credibility, coupled with information from the
> questionnaires regarding jurors' backgrounds, opinions, and
> sources of news, gave the court a sturdy foundation to
> assess fitness for jury service . ... The jury's not-guilty
> verdict on nine insider-trading counts after nearly five
> days of deliberation, meanwhile, suggests the court's
> assessments were accurate. Skilling, we conclude, failed to
> show that his voir dire fell short of constitutional
> requirements.

Skilling, 130 S.Ct. at 2922-2923 (citations and footnotes
omitted).

Here, "there were eight days of jury selection," State v.
Zhu, 165 N.J. at 551, as opposed to five hours in Skilling. In
Petitioner's case, like Skilling's, the Law Division used a
questionnaire prepared by defense and the judge followed up with
face-to-face questioning aimed at bias. Also, the fact that the
jury found Petitioner not guilty of counts 10, 11, 12, 18, 19,
20, 21, and 36 suggests that the trial court's and defense
counsels' assessments of juror fitness were accurate. At the
very least, fair-minded jurists would disagree whether the voir
dire was so inadequate that Petitioner was not able to identify
unqualified jurors and, in that case, the standard under
§ 2254(d)(1) is not satisfied. See Harrington, 131 S.Ct. at 786;
Morgan, 504 U.S. at 729.

Petitioner also singles out three jurors who, he claims, were actually biased. "In reviewing claims of this type, the deference due to [trial] courts is at its pinnacle: 'A trial court's findings of juror impartiality may be overturned only for manifest error.'" Skilling, 130 S.Ct. at 2923 (quoting Mu'Min, 500 U.S. at 428). In this case, as in Skilling, no defense counsel regarded these jurors as so biased as to warrant exercise of a peremptory challenge. Skilling, 130 S.Ct. at 2923 n. 31 ("[U]se [of] a peremptory challenge to effect an instantaneous cure of [a trial judge's erroneous for-cause ruling] exemplifies a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury") (citation and internal quotation marks omitted). Moreover, here, as in Skilling, the trial judge (and defense counsel) "had looked [each of these jurors] in the eye and ... heard all [their] answers and] found [their] assertions of impartiality credible." Id. at 2924 (citations and internal quotation marks omitted). Under these circumstances, the New Jersey courts' adjudication of Petitioner's inadequate voir dire claim was not contrary to, or an unreasonable application of Skilling or other Supreme Court holdings. Accordingly, this claim will be denied for lack of merit.

B. Failure to Voir Dire Jury on Prejudicial Publicity

In Ground Two of his habeas petition, Petitioner contends that the trial court committed reversible error by denying

defendants' request to voir dire jurors regarding published
prejudicial information, namely, a newspaper article appearing in
the <u>Bergen Record</u> on December 5, 1995,[3] which had revealed the
substance of co-defendants' statements to police during
interrogation and was not presented to the jury as evidence
during trial, in violation of Petitioner's Sixth and Fourteenth
Amendment rights.

These claims were raised by Petitioner and the co-defendants
on direct appeal. In particular, the facts regarding
Petitioner's Claim Two were recited by the Appellate Division in
its April 5, 1999 Opinion, as follows:

> Because there had been pretrial publicity of the case, the
> trial judge incorporated in his jury selection questionnaire
> a number of questions that probed the prospective jurors'
> awareness of and/or exposure to such publicity and, if so,
> whether the publicity had led to their having formed an
> opinion about the case. He also gave publicity-related
> warnings during the selection process and periodically
> throughout the trial.
>
> During the selection process, an article appeared in the
> local newspaper regarding a hunger strike defendants engaged
> in to protest alleged abuses against them by the Sheriff's
> office. The trial judge refused a request to voir dire the
> prospective jurors about the article but did, as it had
> previously, caution the jurors not to listen to any media
> accounts on TV or radio and not to read any newspaper
> articles regarding the case. He specifically warned the
> panel about the article in that day's paper and reminded
> them that the case had to be decided based on the evidence
> presented in the courtroom, not on what was printed in a
> newspaper.
>
> On September 26, 1995, just prior to opening arguments,
> defense counsel brought to the trial judge's attention an

---

[3] Petitioner also discusses two other instances of
prejudicial articles that had appeared in local newspapers during
the trial. (Pet. Brief at pp. 45-47).

article in that Sunday's Star Ledger which included photos
of all the defendants and a headline which read, "Who Pulled
the Trigger?" The first sentence of the article read, "[i]t
was one of the bloodiest murders the state has ever seen"
.... The trial judge refused counsel's request to voir dire
the jury regarding the article, observing that the Star
Ledger was not as well read in Bergen County as the Record
and the Herald News.  But he again cautioned the jury not to
read any newspaper articles or listen to any TV or radio
broadcasts about the case.  The jury was also told that
newspaper and media accounts were not evidence, were often
based on second- or third-hand information, were not always
accurate, and were not subject to cross-examination by the
attorneys....

The issue of prejudicial publicity did not arise again until
the middle of the trial.  On October 19, 1995, Zin Dan Lin's
counsel was arrested for allegedly assaulting a sheriff's
officer as he was leaving the courtroom.  The incident
apparently occurred out of the presence of the jury.  But a
few days later on October 22, 1995, counsel requested a jury
voir dire, noting that the news regarding the arrest was
"all over the courthouse" and everyone was talking about it.
The trial judge agreed to do so.  Each juror was separately
questioned.

* * *

[The trial judge ultimately] denied defendants' request for
a mistrial but granted the alternative request to dismiss
[one] juror.  During argument on the application, the
prosecutor asserted, "[y]ou're just letting them win.  We
started with fifteen when we should have had sixteen.  We
lost one.  We're going to have one alternative now?"

We cannot be sure, but it may have been this comment which
prompted the trial judge to state the next day, in the face
of yet more publicity, "[t]here are not going to be any more
jury voir dires."  The additional publicity was as follows.
In that morning's Record the prosecutor was quoted as
alleging that defense counsel were maneuvering for a
mistrial because they knew "they don't have a case."  [Two
other articles allegedly quoting the prosecutor were brought
to the judge's attention.]

This prompted the judge to enter a gag order against all
attorneys and all members of the Sheriff's Department.  But
he declined to voir dire the jurors on the three news
articles ...

\* \* \*

In essence, the trial judge, though troubled by the then
flood of publicity, viewed the articles, for the most part,
as extraneous to the case and not containing any evidential
or prejudicial material.  In light of his prior admonitions
to the jury concerning publicity about the case, the judge
found no need to go through another round of voir dires.  We
think his reasoning for not doing so is sound and find no
basis for interfering in the exercise of his discretion.

More troublesome, however, is the judge's handling of an
article that appeared in the <u>Record</u> on December 5, 1995.
When the jury was excused on December 4, 1995, it was not
cautioned about news articles, although it had been so
cautioned periodically throughout the trial.  The article
that appeared the next day in the <u>Record</u> was placed on pages
one and five of the local section and bore the rather
innocuous headline "Defense arguments begin in gang case."
On page one, the article stated that two of the defendants
had not presented a defense but that codefendant Zhu had
called five witnesses in an attempt to show that he was "an
unwitting bystander" who had left Boston in May to see a
concert.  The article continued on the fifth page....  It
then set forth in one paragraph the prosecutor's theory that
the killings resulted from a power struggle within the ranks
of the Fuk Ching gang, and followed with information that
the defense would wrap up their case quickly....  [T]he
article also reported that the trial judge had determined,
following a mid-trial voluntariness hearing, that the
defendants' statements could be used at trial should they
testify because the allegations that the police had beaten
and coerced them were false.  Specifically, the article
stated:

> None of the remaining three defendants is expected to
> take the stand in the wake of Judge William C. Meehan's
> decision that the statements the men gave to police
> could be used against them.  Last week, defense
> attorneys had argued that the defendants were beaten
> and coerced....  But Monday morning, Meehan decided the
> accusations were false and the statements were
> admissible.
>
> According to summaries of those statements, which
> likely will never be heard by the jury, four of the
> defendants admitted to being at the scene, but none
> said he killed anyone.  Dan Xin Lin said he pointed his
> Uzi at one of the injured victims, but that the gun
> failed.  Chao Lin Feng said he was offered $100,000 to

32

> participate in the revenge killings, while Jeffrey Zhu
> admitted he drove four of the defendants to Teaneck and
> had been told to go upstairs in the house to serve as a
> lookout.
>
> Meanwhile, one defendant, Cho Lee Lin, said he had been
> held hostage in the house for a month and, when he
> heard the shots, crawled out a window and hid in the
> van.  Another, Yun Lin, said he rode in the van, but
> that it never stopped and he never saw any weapons or
> blood.
>
> The sixth defendant, Simon Lau, who was arrested in
> Florida this year, never made a statement to police.  A
> seventh suspect, Shing Chung, remains at large.

The recitation at the end of the article of defendants'
police statements casts this article in a different light
from all of the others.  Though the statements could have
become evidential, albeit with limiting instructions, they
did not since defendants chose not to testify.  The December
5, 1995 article, thus, contained evidence that was never
presented to the jury. The potential for prejudicial jury
taint, then, was for more serious than with the prior
articles....  [W]hen the jury was brought into the
courtroom, the judge instructed:

> Before we start, it was brought to my attention
> yesterday I forgot to remind you please do not read any
> articles relating to this case.  Articles are not
> always accurate and correct and are not evidence in the
> case.  Please don't read any articles or discuss them
> among yourselves or with anyone else.

State v. Lin, Docket No. A-5041-95T4 slip op. at 15-25.

The Sixth Amendment of the United States Constitution

provides that "the accused shall enjoy the right to ... trial by

an impartial jury."  U.S. Const. amend. VI.  "The theory of our

[trial] system is that the conclusions to be reached in a case

will be induced only by evidence and argument in open court, and

not by any outside influence, whether of private talk or public

print."  Skilling, supra, 130 S.Ct. at 2913.  Supreme Court

"decisions, however, cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process.  Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*."  *Id.* at 2914-15 (citation and internal quotation marks omitted)(emphasis in original).  See also Irvin v. Dowd, 366 U.S. 717, 722 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case").  Moreover, "[t]he jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial."  Skilling, 130 S.Ct. at 2916 (quoting United States v. Arzola-Amaya, 867 F.2d 1504, 1514 (5th Cir. 1989)).

The Supreme Court noted that its "decisions have rightly set a high bar for allegations of juror prejudice due to pretrial publicity.  News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates.  And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented."  Skilling, 130 S.Ct. at 2925 n.34.  "Jurors ... need not enter the box with

empty heads in order to determine the facts impartially. 'It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court.'" Skilling, 130 S.Ct. at 2925 (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).

When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." Mu'Min v. Virginia, 500 U.S. 415, 427 (1991). "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record-among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." Skilling, 130 S.Ct. at 2918. Lines of inquiry that "might be helpful in assessing whether a juror is impartial" are not hard to conceive. Mu'Min, 500 U.S. at 425. "To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these

questions must render the defendant's trial fundamentally unfair." Id. at 425-426. Fundamental unfairness arises if voir dire is not "adequate ... to identify unqualified jurors." Morgan, 504 U.S. at 729.

In Mu'Min, the Supreme Court held that the Constitution does not require the state trial court to put questions about the content of publicity to potential jurors. Id. at 425-26. The Supreme Court concluded:

> The voir dire examination conducted by the trial court in this case was by no means perfunctory. The court asked the entire venire of jurors four separate questions about the effect on them of pretrial publicity or information about the case obtained by other means. One juror admitted to having formed a belief as to petitioner's guilt and was excused for cause. The trial court then conducted further voir dire in panels of four, and each time an individual juror indicated that he had acquired knowledge about the case from outside sources, he was asked whether he had formed an opinion; none of the jurors seated indicated that he had formed an opinion. One juror who equivocated as to her impartiality was excused by the trial court on its own motion.

Mu'Min, 500 U.S. at 431.

In this case, the Appellate Division rejected Petitioner's publicity claim as follows:

> In State v. Bey ..., 112 N.J. at 74-92, 548 A.2d 846, the [New Jersey Supreme] Court emphasized the need for determining whether jurors were exposed to prejudicial outside influences in the context of trial publicity.... If ... the Court determines that there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of the jury, it should conduct a voir dire to determine whether any exposure has actually occurred ...
>
> * * *

To begin with, we are convinced that it is only defendants'
police statements that might be prejudicial should the
jurors have learned of them through the news articles....
But reference to those statements was at the end of the
article and located on a continued page.  Moreover, there is
no indication in the caption of the article that such
information might be found therein.  In addition, the
statements were not *per se* inadmissible and would have been
used by the State to impeach defendants had they
testified....

Moreover, for most of the defendants, the statements were
not incompatible with the general thrust of the defense.
The defense proffered at trial, generally, was that the
State's evidence was suspect and that, if the jury were to
conclude that they were at the scene, they were not involved
in purposeful or knowing murders.  We recognize that the
reported statements of Chao Lin Feng and Yun Lin might seem
contradictory to their trial defense in that each seemed to
argue at trial that they were mistakenly identified as
perpetrators, either as principle of accomplice, whereas
their statements placed each at the scene. However, the
statements, even if learned of by the jurors, pale in
comparison to the overwhelming evidence properly presented
to the jury.  We cannot see how knowledge of them could
have, therefore, been prejudicial.

In any event, we are satisfied the second step of the <u>Bey</u>
analysis was not established.  Unlike the situation
presented in <u>Bey</u> where the highly prejudicial information
had been the subject of repeated coverage in the press (at
least five newspaper articles), the complained-of material
here was published only once.  It received no prominence.
Indeed, as we have said, the reported statements were
located in the middle of the New Jersey section of the paper
at the end of an otherwise innocuous article.  None of the
objectionable material was even hinted at in the headline.
Hence, the extent, notoriety and prominence of the media
coverage afforded this material militates against a finding
that a repeated publicity-warned juror was exposed to it.

We also take note of the fact that his jury seems to have
rather conscientiously weighed and analyzed the evidence.
The acquittals of the arson felon-murders, the kidnapping
felony-murders of Liang Wang Guo, Yu Ping Zhang, Guang Sheng
Li, and the possession of a defaced .25 caliber Raven Arms
semi-automatic revolver, reflect that.

* * *

37

Therefore, while it might have been better had the trial judge acceded to the request to voir dire the jurors, we are convinced the failure to do so was not error requiring a reversal.

State v. Lin, Docket No. A-5041-95T4 slip op. at 27-33 (citations and internal quotation marks omitted).

Here, Petitioner argues in his Reply that the New Jersey courts' rejection of his publicity claim was contrary to, or an unreasonable application of Sheppard v. Maxwell, 384 U.S. 333 (1966). Sheppard was a § 2254 case brought by Dr. Sam Sheppard who was indicted for murdering his wife and who faced the death penalty. The Supreme Court ruled that the pretrial and trial publicity deprived Sheppard of a fair trial. However, Sheppard is factually distinguishable, in that Sheppard faced the death penalty; the judge merely requested or suggested that the jury refrain from reading, watching or listening to reports about the case; the judge allowed the newspapers to publish the names and addresses of jurors, who were bombarded with press and letters; three months before trial, a public inquest was televised, where Sheppard was examined for five hours without counsel and the inquest "ended in a public brawl," id. at 354; the trial began two weeks before a hotly contested election at which both the Chief Prosecutor and the judge were candidates for judgeships; "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," id. at 355, and a press table was set up inside the bar; "[p]articipants in the trial, including the jury, were forced to run a ga[u]ntlet of

reporters and photographers each time they entered or left the

courtroom," id.; and

> [m]uch of the material printed or broadcast during the trial
> was never heard from the witness stand, such as the charges
> that Sheppard had purposely impeded the murder investigation
> and must be guilty since he had hired a prominent criminal
> lawyer; that Sheppard was a perjurer; that he had sexual
> relations with numerous women; that his slain wife had
> characterized him as a "Jekyll-Hyde"; that he was "a
> barefaced liar" because of his testimony as to police
> treatment; and finally that a woman convict claimed Sheppard
> to be the father of her illegitimate child. As the trial
> progressed, the newspapers summarized and interpreted the
> evidence, devoting particular attention to the material that
> incriminated Sheppard, and often drew unwarranted inferences
> from testimony. At one point, a front-page picture of Mrs.
> Sheppard's blood-stained pillow was published after being
> 'doctored' to show more clearly an alleged imprint of a
> surgical instrument.

Id. at 356-57.

The facts in this case regarding prejudicial publicity pales

in comparison to the media circus that occurred in and outside

the courtroom in Sheppard. Moreover, the daily assault of media

and press coverage with highly prejudicial and non-evidentiary,

inflammatory information, to the point that even jurors were

included in the media scrutiny, is factually distinguishable from

this case. Accordingly, this Court holds that the New Jersey

courts' rejection of this prejudicial publicity claim is not

contrary to, or an unreasonable application of Skilling,

Sheppard, or other Supreme Court holdings, and Petitioner is not

entitled to habeas relief on this ground.

C. Court Security Measures Violated Due Process

In Ground III of his habeas petition, Petitioner argues that

the security measures impermissibly gave the jury the perception

that he was guilty and thereby deprived him of a fair trial, as guaranteed under the Fifth, Sixth and Fourteenth Amendments. In particular, Petitioner alleges that his trial was marked by "an unprecedented and pervasive presence of Bergen County Sheriff Officers and other police officers in the courtroom at all times, commencing with the first day of trial. These officers were constantly standing by or near the defendants, as if on the look out for an attempted escape or commission of acts of violence by the defendants, who stood accused of several extremely violent acts. In short, the courtroom too[k] on the appearance of a war zone or an armed camp." (Pet. Brief at pp. 49-50). Petitioner further argues:

"On the first day, co-counsel made reference to the needless and extraordinary security procedures that were being employed, including the searching of counsel, the jurors and court personnel. ... . [T]here were six Sheriff Officers, one for each defendant, and they were standing directly behind each defendant. ... Counsel argued that this caused a "chilling effect" and that the effect of this heightened security was very intrusive. ... ." (Id. at pg. 50). Petitioner also relates that a Sheriff's officer would make faces at counsel during cross-examination of a witness, that defendants would be awakened at 5:00 a.m. for a 9:00 a.m. court appearance, defendants would be kept in their cells for 23 hours a day, defense counsel were searched before entering court, and defendants were repeatedly strip searched and otherwise mistreated. These complaints were

made known to the trial court and the court either responded cavalierly or was unmoved and refused to hold a hearing on the matter. (Id. at pp. 51-53). Some of the security issues affected the jury as well. For instance, "the attorneys and some potential jurors were directed by officers to proceed through the courtroom via a path which was not the most direct to the jury box .... [T]here was no reason to do this, except to raise the concern that jurors might fear for their safety... ." (Id. at pg. 53).

The security measures also impacted the defendants' right to participate in their defense. Petitioner alleges that "the officers were not allowing defendants to bring their notes with them, ... and were required to turn their notes over to officers, to be returned the next day." (Id. at pp. 53-54). Moreover, some of these incidents had reached the media, further tainting the trial. At this point, most all defense counsel requested a mistrial or at the very least, a plenary hearing to determine whether the Sheriff's officers had prejudices against defendants that caused them to conduct such "extraordinary and oppressive security measures." The trial court declined to entertain such a hearing and denied defendants's motion for a mistrial, stating that these matters did not "go to the guilt or innocence of these defendants." (Id. at pp. 54-56).

Counsel then lodged another complaint concerning the Sheriff's officers searching the briefcases and papers of the attorneys themselves. In one incident, counsel was subjected to

Case 2:10-cv-05489-DMC  Document 15  Filed 08/01/12  Page 42 of 62 PageID: 1211

a search of his person and was required to raise his hands several times despite having passed through the metal detector. The court took no remedial action other than to say that if the files contained no metal and did not set off the metal detector, they would not be searched.  (Id. at pp. 56-57).

Finally, Petitioner argues that "[t]he trial court completely abdicated its crucial role of guarding the right of defendant to a fair trial for the sake of expediency and for, clearly, not wanting to bother itself with details of the court security which had undeniabl[y] begun to impinge on the sanctity of the judicial process.  The trial court repeatedly refused defense requests to hold a hearing on the security issue or to intervene in the security issues.  The end result was a "Kafkaesque" type of trial, one in which the pervasive "feeling" of guilt so overshadowed the defendant and overwhelmed the jury that there was absolutely no chance whatsoever of defendant receiving a fair trial."  (Id. at pg. 57).

Petitioner raised this issue on direct appeal, and the New Jersey Supreme Court issued a published opinion, holding that the heightened security measures did not deprive the defendants of a fair trial or create an unacceptable atmosphere suggestive of guilt under the standard set forth in Holbrook v. Flynn, 475 U.S. 560 (1986).  First, this Court notes that the New Jersey Supreme

Court found the following facts, which are entitled to the

presumption of correctness[4]:

> On May 22, 1995, the trial court conducted a hearing during
> which defense counsel questioned Captain Benedetto regarding
> the proposed [security] plan.... Captain Benedetto
> explained that in addition to passing through metal
> detectors located at the main entrances to the courthouse,
> all individuals entering the courtroom would be cleared each
> day by security personnel employing magnetometers (handheld
> metal detectors that resemble wands).... Additionally,
> Sheriff's officers positioned outside the courtroom would
> visually inspect any handbags, packages, or briefcases
> belonging to any person seeking entry. Security personnel
> employing those procedures would clear all persons entering
> the courtroom, including jurors, counsel, judicial staff,
> spectators, and the judge himself.
>
> Captain Benedetto explained that the heightened security
> plan was necessary because: first, the Sheriff's Office
> believed that an organized criminal group had threatened the
> lives of one or more defendants; second, there was a
> possibility that a family member of the judge, his staff, or
> the jurors might be held hostage and a family member of that
> hostage would be compelled to smuggle a weapon into the
> courtroom in exchange for the hostage's safety; and third,
> it might be possible for someone to bypass the security
> checkpoints at the two main entrances because of the large
> number of other entrances to the courthouse ...
>
> At the conclusion of the hearing, the trial court announced
> its intention to enter an order essentially codifying the
> proposed procedures.... On May 30, 1995, the trial court
> entered an order formally adopting the security plan.... In
> its cover letter to all counsel enclosing that order, the
> court noted that any party objecting to the provisions of
> the order could petition the Appellate Division for review.
> Two defendants sought leave to appeal from the order [and
> t]he Appellate Division denied that request.

---

[4] The Supreme Court has emphasized that "[f]actual
determinations by state courts are presumed correct absent clear
and convincing evidence to the contrary, § 2254(e)(1), and a
decision adjudicated on the merits in a state court and based on
a factual determination will not be overturned on factual grounds
unless objectively unreasonable in light of the evidence
presented in the state-court proceeding, § 2254(d)(2)."
Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

The trial began on September 11, 1995, and ended on December 15, 1995.... As part of voir dire, every juror was asked the following question:

The Bergen County Sheriff's Office has determined that increased security measures are necessary for this trial.... Do you understand that the security measures have nothing to do with the guilt or innocence of each defendant and should not affect your verdict in any way ... ?

No cautionary instruction was given to the jury during the trial or before deliberations, and none was requested by defendants.

The Sheriff's Office implemented the security plan essentially as described in the court's order....  For our purposes we will assume that the number of uniformed officers fluctuated between eighteen (the average of defendants' claims) and eleven (the average of the State's claims), depending on the day.  The record is clear that one officer stood directly behind each defendant throughout trial.

State v. Zhu, et al., 165 N.J. at 549-551.

After reviewing the Holbrook standard, the New Jersey

Supreme Court:

conclude[d] that the security plan did not pose an unacceptable risk of unfairness.  Our reasons are similar to those noted by the Appellate Division:

First, at no time was a finding made, or an accusation brought, that extra security measures were needed because of the conduct, character, or prior record of the defendants....  That is, the extra security was needed purportedly to protect defendants, and everyone else involved in the trial, from threats from outside parties—not to protect anyone from the defendants....  Second, all prospective jurors were asked in their questionnaires whether they understood that increased security measures, including the search of all persons entering the courtroom, had nothing to do with the guilt or innocence of defendants. Third, the patent, and unacceptable, hostility displayed towards the defense attorneys was, for the most part, out of the presence of the jury, and not in the courtroom itself.
* * *

Common experience informs us that citizens have become accustomed to the presence of security personnel in most public places, including schools ....  Such common practices

44

help prevent jurors from drawing any undue inferences at the
sight of similar security measures in a courthouse setting
....

Nor do we conclude that the trial court impermissibly
delegated its responsibilities to the Sheriff ....   Because
the crimes alleged in the indictment were the product of a
violent, intra-gang rivalry capable of reaching into the
courtroom, we cannot fault the trial court for accepting
Captain Benedetto's testimony, even though additional
findings to enhance that testimony might have strengthened
the basis for the court's action.

Accordingly, we hold that the heightened security measures
in this case did not deprive defendants of a fair trial
before an impartial jury.   Even if we assume some slight
error on the part of the trial court in the manner in which
the security plan was adopted and implemented, or by the
court's failure to deliver an unsolicited cautionary charge
to reinforce the voir dire, such error was not clearly
capable of contributing to the verdict in view of the
overwhelming evidence of defendants' guilt.

Zhu, 165 N.J. at 554-56.

In Estelle v. Williams, 425 U.S. 501 (1976), the Supreme

Court stated that "the State cannot, consistently with the

Fourteenth Amendment, compel an accused to stand trial before a

jury while dressed in identifiable prison clothes, id. at 512,

"but held that the defendant in that case had waived any

objection to being tried in prison clothes by failing to object

at trial."   Carey v. Musladin, 549 U.S. 70, 75 (2006).   In

Holbrook v. Flynn, six co-defendants were being tried for robbing

the Bonded Vault Co. at gunpoint, breaking into safe-deposit

boxes in the vault and escaping with four million dollars in cash

and valuables.   Throughout the course of the jury selection and

trial, a uniformed and armed state trooper sat behind each

defendant in the first spectator row.   Holbrook, 475 U.S. at 563

n. 2 (citation omitted).   After pursuing the issue on direct

appeal, Charles Flynn filed a § 2254 petition, which the district court denied. The First Circuit reversed, finding as follows: "[W]ith no threats shown to safety, [the trial judge] balanced nothing, but simply indicated a fear that since the defendants had not been bailed, they might flee from the courtroom. There was no evidence even suggesting any unusual likelihood of this; nor had anything whatever made 'manifest' the 'necessity for heightened security. Even if all jurors had indicated an unreserved opinion that the troopers' presence would not affect them, such expression, on a case as extreme as this, where there was no need to rely on it, is totally unacceptable." Id. at 566-67.

The Supreme Court reversed the court of appeals. First, the Supreme Court noted:

> Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.

> Our faith in the adversary system and in jurors' capacity to adhere to the trial judge's instructions has never been absolute, however. We have recognized that certain practices pose such a threat to the fairness of the factfinding process that they must be subjected to close judicial scrutiny ....

Holbrook, 475 U.S. at 567-68 (citations and internal quotation marks omitted).

Second, the Holbrook Court held that the conspicuous deployment of armed security personnel during trial is not the sort of "inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." Holbrook, 475 U.S. at 568-69. Accordingly, "the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play." Id. at 570 (citation and internal quotation marks omitted).

Third, the Court further held that "we simply cannot find an unacceptable risk of prejudice in the spectacle of four [armed state troopers] quietly sitting in the first row of a courtroom's spectator section." Id. at 571. "We note, moreover, that even were we able to discern a slight degree of prejudice attributable to the troopers' presence at respondent's trial, sufficient cause for this level of security could be found in the State's need to maintain custody over defendants who had been denied bail after an individualized determination that their presence at trial could not otherwise be ensured. Unlike a policy requiring detained defendants to wear prison garb, the deployment of troopers was intimately related to the State's legitimate interest in maintaining custody during the proceedings and thus did not offend the Equal Protection Clause by arbitrarily

47

discriminating against those unable to post bail or to whom bail had been denied." Id. at 571-72. See also Deck v. Missouri, 544 U.S. 622, 629 (2005)("[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial"); Illinois v. Allen, 397 U.S. 337, 344 (1970)(Supreme Court conceded that in extreme situations shackling and gagging of defendant may be "the fairest and most reasonable way to handle" a particularly disruptive defendant).

Fourth, the Holbrook Court clarified the limited nature of review of such a claim in a habeas petition under § 2254:

> [O]ur task here is not to determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom. While, in our supervisory capacity, we might express a preference that officers providing courtroom security in federal courts not be easily identifiable by jurors as guards, we are much more constrained when reviewing a constitutional challenge to a state-court proceeding. All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

Holbrook, 475 U.S. at 572 (footnote omitted).

Here, Petitioner has not shown that the challenged security measures were inherently prejudicial or caused actual prejudice. See Holbrook, 475 U.S. at 572. Accordingly, this Court finds that the New Jersey Supreme Court's rejection of his Sixth and Fourteenth Amendment claim that heightened security measures violated his right to a fair trial was not contrary to, or an

unreasonable application of <u>Holbrook</u> or other Supreme Court
holdings.  <u>See</u> <u>Sutton v. Bell</u>, 645 F.3d 752, 756 (6th Cir. 2011)
(holding that increased security consisting of four guards behind
defense table, one next to jury, two in balcony, and one at each
of courtroom's three doors in trial of three inmates for
violently murdering an inmate was not unconstitutional under
<u>Holbrook</u>).   Therefore, habeas relief is not warranted on
Petitioner's Ground Three.

D.   <u>Jury Charge on Accomplice Liability</u>

     In Ground Four, Petitioner argues that the trial court's
accomplice liability instruction failed to convey to the jury
that in any or all of the offenses charged, the accomplice could
be found guilty to a lesser degree than the principal, based on
the accomplice's own mental state.   Thus, this allegedly
erroneous accomplice charge undermined the prosecutor's burden to
prove guilt beyond a reasonable doubt, and rendered Petitioner's
trial fundamentally unfair in violation of his right to a fair
trial and due process guaranteed under the Sixth and Fourteenth
Amendments.

     Petitioner and other co-defendants raised this claim on
direct appeal.   The Appellate Division rejected the claim without
discussion.   <u>See</u> <u>State v. Lin</u>, Docket No. A-4196-95T4 slip op. at
4 & 6 ("We are satisfied that defendants received as fair a trial
as they could, under the circumstances.   We are also satisfied
that the convictions were based upon overwhelming evidence of
defendants' guilt.   While, therefore, there may have been some

trial errors, none of them are such as to require reversal. We have carefully examined all of the numerous contentions raised by counsel and pro se defendants in light of the entire record and applicable law and are convinced all but three issues require no further opinion.").

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief. Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted); see also Smith v. Spisak, ___ U.S. ___, 130 S.Ct. 676, 684 (2010)(no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); Waddington v. Sauausad, 555 U.S. 179 (2009).

The United States Court of Appeals for the Third Circuit has observed that a habeas petitioner who challenges state jury instructions must "point to a federal requirement that jury instructions ... must include particular provisions," or

demonstrate that the jury "instructions deprived him of a defense

which federal law provided to him." Johnson v. Rosemeyer, 117

F.3d 104, 110 (3d Cir. 1997). This is because district courts do

not "sit as super state supreme courts for the purpose of

determining whether jury instructions were correct under state

law with respect to the elements of an offense and defenses to

it." Id. As the Third Circuit explained,

> In considering whether this case involves a claim of error
> under the Constitution, laws, or treaties of the United
> States, it is critical to remember that the Supreme Court
> has made it clear that the states define the elements of
> state offenses. Accordingly, while there may be
> constitutionally required minimum criteria which must be met
> for conduct to constitute a state criminal offense, in
> general there is no constitutional reason why a state
> offense must include particular elements. See McMillan v.
> Pennsylvania, 477 U.S. 79, 84-86, 106 S.Ct. 2411, 2415-16,
> 91 L.Ed.2d 67 (1986).
>
> It thus follows that for the error of state law in the
> justification instructions, assuming that there was an
> error, to be meaningful in this federal habeas corpus
> action, there would have to be a body of federal law
> justifying the use of deadly force which is applicable in a
> state criminal action charging an offense based on the
> defendant's use of that force. Then the error in the jury
> instructions would be significant if the instructions did
> not satisfy that body of law. Put in a different way, the
> jury instructions on justification, even if correct under
> state law, would need to have relieved the state of the
> necessity of proving an element of the offense as required
> by federal law or to have deprived the petitioner of a
> defense the state had to afford him under federal law in
> order to be significant in a federal habeas corpus action.
> If we concluded that a petitioner could obtain habeas corpus
> relief without making such a showing, then district courts
> in habeas corpus cases would sit as super state supreme
> courts for the purpose of determining whether jury
> instructions were correct under state law with respect to
> the elements of an offense and defenses to it.

Johnson, 117 F.3d at 110.

However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence." Cool v. United States, 409 U.S. 100, 104 (1972). See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused); Smith v. Horn, 120 F.3d 400, 416 (1997), cert. denied, 522 U.S. 1109 (1998)(the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law.").

"[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." Victor v. Nebraska, 511 U.S. 1, 22 (1994). As the Supreme Court explained in Victor, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury. Victor, 511 U.S. at 6 (citations and internal

52

quotation marks omitted). "[A] misdescription of the burden of proof ... vitiates *all* the jury's findings. <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281 (1993) (emphasis in original). Such an error is considered structural and thus is not subject to harmless error review. <u>See</u> <u>id</u>. at 280-82. <u>But</u> <u>see</u> <u>Neder v. United States</u>, 527 U.S. 1, 8-11 (1999) (applying harmless-error analysis where jury was not instructed on an element of an offense).

In this case, the Appellate Division found no error with respect to the jury charge on accomplice liability sufficient to warrant any discussion in its opinion. This Court has carefully reviewed the jury instructions as a whole, as well as the instruction on accomplice liability, and finds no error of constitutional dimension in this case. Further, any deficiencies in the jury instructions were simply harmless error and were not capable of producing an unjust result. <u>See</u> <u>Williams v. Beard</u>, 637 F.3d 195, 223 (3d Cir. 2011)("[E]ven if the trial court's accomplice liability charge was in some respect ambiguous, there is no reasonable likelihood that the jury applied the instruction in a manner that relieved the Commonwealth of its burden of proof with respect to first degree murder."). Indeed, given the overwhelming circumstantial evidence presented at trial against Petitioner in this case, as set forth in the State's response to this petition (Docket entry no. 12 at pp. 35-37), and as set forth in the state courts' rendition of the facts presented in Section I.B of this Opinion, <u>supra</u>, at pp. 5-10, the trial

court's charge to the jury on accomplice liability was proper and did not have the capacity to affect the verdict in any substantial or injurious way or prejudice Petitioner in any way. See Brecht v. Abrahamson, 507 U.S. at 637-38.

Finally, this Court concludes that the jury instruction was not plain error because the trial judge clearly instructed the jury about the State's burden of proof as to each offense and the elements for each offense and the elements for accomplice liability. In short, the jury instructions did nothing "to lift the burden of proof on an essential element of an offense." Therefore, having carefully reviewed the jury charges as a whole, this Court finds that Petitioner was not deprived of a fair trial by the overall jury instructions given, and any error as asserted by Petitioner in this regard was, at the very most, plainly harmless in light of the overall record. Moreover, the Appellate Division's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## E. Ineffective Assistance of Counsel Claims

In Grounds Five of his petition, Petitioner argues that counsel was constitutionally ineffective. In particular, Petitioner argues that counsel "failed to exercise Petitioner's six remaining peremptory challenges to strike jurors Donna Rakowski, Elaine O'Brian and Alma Reavis which resulted in biased

jurors on Petitioner's jury." (Petitioner's Brief at pp. 79-85, Docket entry no. 1-1).

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. See Strickland v. Washington, 466 U.S. 668, 686 (1984). The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland.

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. See Strickland, 466 U.S. at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness," assessing the facts of the case at the time of counsel's conduct. See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001). To meet this first prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690. The court must then determine whether, in light of all the

circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance. Id. In analyzing alleged deficient performance, a court "begin[s] with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy,'" Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1404 (Apr. 4, 2011)(quoting Strickland at 689). A court "'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Cullen, 131 S .Ct. at 1407 (quoting Strickland at 689-90).

If able to demonstrate deficient performance by counsel, then the petitioner must show prejudice, i.e., there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. As the Strickland Court explained, "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." Id. at 693. Thus, the Court held that prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. See id. at 695-96.

As the Supreme Court explained,

> In making this determination, a court hearing an
> ineffectiveness claim must consider the totality of the
> evidence before the judge or jury. Some of the factual
> findings will have been unaffected by the errors, and
> factual findings that were affected will have been affected
> in different ways. Some errors will have had a pervasive
> effect on the inferences to be drawn from the evidence,
> altering the entire evidentiary picture, and some will have
> had an isolated, trivial effect. Moreover, a verdict or
> conclusion only weakly supported by the record is more
> likely to have been affected by errors than one with
> overwhelming record support. Taking the unaffected findings
> as a given, and taking due account of the effect of the
> errors on the remaining findings, a court making the
> prejudice inquiry must ask if the defendant has met the
> burden of showing that the decision reached would reasonably
> likely have been different absent the errors.

Strickland, 466 U.S. at 695-696.

"The benchmark for judging any claim of ineffectiveness must
be whether counsel's conduct *so undermined* the proper functioning
of the adversarial process that the trial cannot be relied on as
having produced a just result." Cullen, 131 S.Ct. at 1403
(quoting Strickland, 466 U.S. at 686 (emphasis in Cullen). Thus,
habeas review of a state court's adjudication of an ineffective
assistance claim is "doubly deferential." Knowles v. Mirzayance,
556 U.S. 111, 123 (2009). To obtain habeas relief, a state
petitioner "must demonstrate that it was necessarily unreasonable
for the [state c]ourt to conclude: (1) that [petitioner] had not
overcome the strong presumption of competence; and (2) that he
failed to undermine confidence in the [outcome]." Cullen, 131
S.Ct. at 1403. In other words, the petitioner must establish
both deficient performance and resulting prejudice in order to
state an ineffective assistance of counsel claim. See Strickland

at 697; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418. However, the Supreme Court further instructed that a district court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

In the instant case, Petitioner presented ineffective assistance of counsel claims in his petition for post-conviction relief. The PCR court rejected the claims, primarily because defendants did not show prejudice, and the Appellate Division affirmed on this basis:

At the outset, we note that the State had a strong case. There were two eyewitnesses to the massacre: Lin Ling Chan and Ming Cheng. They were both familiar with all defendants. Identity was not an issue. In addition, Alan Tam and [Tu] Wai Chung, who had prior knowledge of the conspiracy, testified for the State. Against this background, defense counsel had little proof of arguments to counter the evidence against defendants. From our careful review of the record, we note that counsel vigorously participated in the trial, cross-examining witnesses and making arguments on behalf of their clients. Moreover, there was ample evidence of defendants' guilt.
\* \* \*
It is well-settled that when arguing that counsel failed to conduct a pre-trial investigation or interview witnesses a defendant must do more than make bald assertions of denial of the effective assistance of counsel. When a defendant alleges that his or her attorney inadequately investigated the case, the defendant must assert facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification.... Here, [defendant] has not presented an affidavit or certification to support his assertions ...
\* \* \*

58

> In sum, following the Strickland/Fritz standard, our review of the record does not disclose any deficiency by any of the trial, appellate, or PCR counsels. Further, there is overwhelming evidence that defendants committed the crimes of which they were convicted. Moreover, even if we assumed that, in some respects, defense counsel's representation of any of the defendants was deficient, defendants failed to establish the defendants would have been found not guilty of the charges [i]f their attorneys had handled the matter differently.

State v. Lin, 2010 WL 1330272 *4, *5, *10 (N.J.Super.Ct.App.Div., Apr.6, 2010)(citations and internal quotation marks omitted).

Given the overwhelming evidence of guilt, this Court finds that the New Jersey courts' rejection of Petitioner's ineffective assistance claims for failure to show prejudice was not contrary to, or an unreasonable application of Strickland and its progeny.

Nevertheless, as to the individual claim asserted here, this Court also readily finds no deficient performance sufficient to merit to Petitioner's contentions. As set forth above in this Opinion, this Court found no constitutional violation with respect to Petitioner's jury claims. Thus, his claim concerning counsel's failure to use peremptory challenges likewise fails. See DeLozier v. Sirmons, 531 F.3d 1306, 1323 (10th Cir. 2008)("Generally, an attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness"); Gardner v. Ozmint, 511 F.3d 420, 425-26 (4th Cir. 2007)(noting that "[o]n habeas review, federal courts generally accord particular deference to the judgment of trial counsel during voir dire, state court's determination that

counsel's failure to use a peremptory challenge on allegedly
biased juror was tactical did not warrant habeas relief)
(citation omitted). Thus, Petitioner is not entitled to habeas
relief on his ineffective assistance of counsel claims respecting
the jury selection process and failure to exercise peremptory
challenges. (See also this Opinion, supra, at Section IV.A).

Therefore, this Court concludes that the determination of
the state PCR court and appellate court in finding no
constitutionally ineffectiveness of counsel, resulted in a
decision that was neither contrary to, nor involved an
unreasonable application of clearly established federal law under
Strickland, nor did it result in a decision that was based on an
unreasonable determination of the facts in light of the evidence
presented in the state court proceeding. Williams v. Taylor,
supra. Petitioner has failed to demonstrate that the state court
opinions, when evaluated objectively and on the merits, resulted
in an outcome that cannot be reasonably justified. Matteo, 171
F.3d at 891. Therefore, the Court will deny federal habeas
relief on this ineffective assistance of counsel claim because it
is substantively meritless.

F. Cumulative Error

Finally, in Ground VI, Petitioner argues that the cumulative
effect of all of the alleged errors deprived him of a fair trial.
The test for a "cumulative error" claim is whether the overall
deficiencies "so infected the trial with unfairness as to make
the resulting conviction a denial of due process." See Hein v.

60

Sullivan, 601 F.3d 897, 917 (9th Cir. 2010)(relying on Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); Thornburg v. Mullin, 422 F.3d 1113, 1137 (10th Cir. 2005)(relying on Donnelly); see also Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008)("Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice'").

Petitioner raised his cumulative error claim in his state PCR proceedings. Because the PCR court found no merit to any of Petitioner's claims for post-conviction relief, there is likewise no basis or merit for habeas relief based upon an alleged accumulation of errors which did not exist.

Petitioner does not make any assertions that would suggest actual prejudice, and this Court, after carefully examining the state court record, cannot find any aspect of Petitioner's criminal proceedings suggesting, singularly or cumulatively, anything more than a hypothetical possibility of prejudice. Correspondingly, this claim does not merit habeas relief, since the state court's dismissal of Petitioner's cumulative error argument was not an unreasonable application of Supreme Court precedent.

## V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue. See Third Circuit Local Appellate Rule 22.2. The Court may issue a certificate of appealability

only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue. Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue. An appropriate Order follows.

DENNIS M. CAVANAUGH
United States District Judge

DATED: 8/1/12